IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-CT-3113-FL

| | | |
|---|---|---|
| PERRY VINCENT KNOWLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| ROBERT C. LEWIS, PAULA Y. | ) | |
| SMITH, and JOSEPH LIGHTSEY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the court on the motions for summary judgment pursuant to

Federal Rule of Civil Procedure 56 of defendant Dr. Joseph Lightsey ("Lightsey") (DE 74) and

defendants Director of Prisons Robert C. Lewis ("Lewis") and Director of Health Services Paula Y.

Smith ("Smith") (DE 71). The issues raised were fully briefed and are ripe for adjudication. For

the following reasons, the court grants defendants' motions for summary judgment.

## STATEMENT OF THE CASE

On June 20, 2011, plaintiff, a state inmate, filed this action pursuant to 42 U.S.C. § 1983,

alleging that the above-named defendants, as well as previously-dismissed defendant Assistant

Superintendent for Programs Harold Webster ("Webster"),[1] acted with deliberate indifference to

plaintiff's serious medical needs in violation of the Eighth Amendment to the United States

---

[1] Where all claims against defendant Webster were dismissed by order entered August 22, 2012, described
in more detail herein, the court constructively amends the caption for purposes of this order to specify only those
defendants against which claims remain for disposition.

Constitution. Specifically, plaintiff alleges that defendant Lightsey acted with deliberate indifference to his exposure to too much sunlight and complaints of joint pain, fatigue, itching, and rashes while plaintiff was housed at Johnston Correctional Institution ("Johnston"). Plaintiff also alleges in pertinent part that defendants Lewis and Smith acted with deliberate indifference to his prison conditions in violation of the Eighth Amendment, on grounds that plaintiff wrote several letters to Lewis and Smith complaining that he was exposed to too much sunlight, but that neither defendant took action to remedy his complaint.

As relief, plaintiff requests both monetary damages and injunctive relief. Specifically, plaintiff requests monetary damages in the amount of one thousand five hundred dollars ($1,500) per day that he is housed at Johnston. Plaintiff also requests an injunction ordering his immediate transfer to a facility that would give him protection from over-exposure to sunlight.

On November 14, 2011, plaintiff filed a motion to amend his complaint to clarify defendant Webster's name, which the court granted. Plaintiff filed a second motion to amend his complaint on January 19, 2012, which repeated the substantive allegations of the original complaint.

Defendants then filed respective motions to dismiss, arguing that plaintiff failed to state a claim upon which relief may be granted. On August 22, 2012, the court entered an order granting plaintiff's motion to amend. As part of that order, the court conducted an initial review of plaintiff's amended complaint and directed plaintiff to particularize his allegations. The court also denied defendant Lightsey's motion to dismiss as to plaintiff's request for monetary damages, but granted defendant Lightsey's motion to dismiss as to the request for injunctive relief. Finally, as for the motion to dismiss filed by defendants Lewis, Smith, and Webster, the court granted the motion as to plaintiff's claims against defendant Webster, granted the motion as to the supervisor liability

2

claims against defendants Lewis and Smith arising out of the alleged deliberate indifference to plaintiff's medical care, and allowed the remainder of the claims to proceed. Plaintiff filed his particularized pleading on September 5, 2012, in which he supplements his allegations as stated above and raises a claim pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*

The remaining defendants in this case, defendants Lightsey, Lewis, and Smith, thereafter filed their respective motions for summary judgment, arguing that plaintiff failed to establish a constitutional violation. These defendants alternatively assert the affirmative defense of qualified immunity.

In support of his motion for summary judgment, defendant Lightsey submitted an affidavit and detailed medical records pertaining to the medical treatment that is the subject of the complaint. In support of their motion for summary judgment, defendants Lewis and Smith submitted an affidavit of two nurses involved in plaintiff's medical treatment. In opposition to summary judgment, plaintiff submitted sworn declarations of both himself and his brother Marvin Julian Knowles. Plaintiff also submitted medical brochures, discovery responses, correspondences, and documents from the prison's administrative remedy procedure. As part of his response to Lightsey's motion for summary judgment, plaintiff also asserts a new claim for retaliation against Lightsey.

## STATEMENT OF UNDISPUTED FACTS

The undisputed facts pertinent to the court's ruling may be summarized as follows. Plaintiff was diagnosed with systemic lupus erythematosus[2] ("lupus" or "SLE") prior to his transfer to

---

[2] SLE is a systemic autoimmune disease that may affect certain parts of the body, including the skin, joints, kidneys, brain, and other organs. (Lightsey Aff. ¶ 6.) SLE is an inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigue, joint pains or arthritis, skin lesions, swelling and other symptoms. (Id.) The symptoms of SLE vary from person to person, and may come and go. Id.

3

Johnston on June 17, 2010. (Lightsey Affidavit ¶ 7.) On June 17, 2010, plaintiff was examined by a nurse, upon his arrival at Johnston, for an admission health screening. (Id. Exs. 3, 7.) During the examination, the nurse noted that plaintiff was being treated for SLE, rheumatoid arthritis, and an unspecified connective tissue disorder. (Id.) Plaintiff informed the nurse that he used sunglasses as a medical device/equipment. (Id.) The nurse assessed that plaintiff was medically fit to be housed with the general population. (Id. Ex. 3.)

On June 19, 2010, Officer Daughtry contacted the nursing staff to confirm that plaintiff was allowed to wear sunglasses in the dorm during inmate count. (Id. ¶ 8 and Ex. 4.) The nurse noted that there was a notation in plaintiff's health screening that plaintiff was allowed sunglasses for one year due to his lupus diagnosis. (Id.) The nurse then consulted the Central Prison Emergency Department ("CPED") attending physician, Lightsey, to determine plaintiff's need for sunglasses while in the dorm. (Id.) Lightsey informed the nurse that plaintiff did not require sunglasses while in the dorm. (Id.)

On June 21, 2010, a nurse examined plaintiff in response to a sick call request plaintiff submitted on June 19, 2010. (Id. ¶ 9 and Ex. 5.) Upon examination, the nurse noted that plaintiff was wearing wrap-around Oakley sunglasses. (Id.) The nurse also noted that the Ophthalmology clinic previously recommended sunglasses for plaintiff, but did not specify the need for wrap-around sunglasses. (Id.) The nurse referred plaintiff for evaluation for the use of wrap-around sunglasses (for use while outdoors). (Id.) Physicians Assistant Laurie Astern ("PA Astern") subsequently determined that plaintiff was permitted regular sunglasses and not wrap-around sunglasses for the time period of June 23, 2010, through August 18, 2010. (Id. ¶ 10 and Ex. 6.)

4

Plaintiff again was examined by a nurse, on June 25, 2010, in response to a sick-call request, plaintiff submitted on June 23, 2010, complaining that he was being exposed to too much sunlight at Johnston when he walked from one building to the next, when he was waiting in line to receive medications, meals, and at the mail room. (Id. ¶ 11 and Ex. 7.) The nurse noted that plaintiff complained that he experienced skin blotches, joint pain, and fatigue when he was in the sun. (Id.) The nurse referred plaintiff's chart to the physician or physician's assistant for review to determine whether there was any medical indication that plaintiff was being over-exposed to the sun. (Id.) The nurse also instructed plaintiff that if he wished to be transferred to another facility, he needed to consult his programmer. (Id.)

On June 30, 2010, PA Astern reviewed plaintiff's chart in response to plaintiff's June 25, 2010, sick call request. (Id. ¶ 12 and Exs. 6, 8, 9.) PA Astern wrote Utilization Review Requests ("UR requests") for white cotton gloves and an optometry consult due to plaintiff's reported change in visual acuity. (Id.) It was subsequently determined that the gloves were being ordered for warmth, and the UR request was changed from white cotton gloves to Isotoner gloves. (Id.)

A few days later, Lightsey reviewed plaintiff's chart and discussed with the nurse and medical staff plaintiff's request to use opaque glasses at all times.[3] (Id. ¶ 13 and Exs. 6, 10.) Lightsey stated that sunglasses may be appropriate in the event of activation of conjunctivitis (swelling or infection of the membrane lining of the eyelids) due to ultraviolet radiation of bright sunlight only. (Id.) However, Lightsey noted that plaintiff had not reported any symptoms indicating conjunctivitis. (Id.) Lightsey then wrote an order clarifying that the use of sunglasses indoors was not approved. (Id.)

---

[3] The discussion regarding this issue occurred as a result of plaintiff filing a grievance on June 21, 2010, regarding his request to wear sunglasses while indoors. (Lightsey Affidavit ¶ 13 and Exs. 6, 10.)

5

On July 2, 2010, plaintiff was examined by a nurse in response to a sick call request plaintiff submitted on July 1, 2010, in which plaintiff sought renewal of his Benadryl prescription. (Id. ¶ 14 and Ex. 11.) Upon examination, the nurse noted that plaintiff complained of generalized itching over his entire body that was worse in the area of his trunk, throat, and nasal passages. (Id.) Several days later, plaintiff was examined in response to a sick call request complaining of eye pain when he removed his sunglasses while indoors. (Id. ¶ 15 and Ex. 12.) Further, the nurse noted that plaintiff was scheduled to see Dr. Jessica Chow ("Dr. Chow") at the Duke Eye Center. (Id.)

On July 14, 2010, plaintiff attended an appointment with Dr. Chow at the Duke Eye Center. (Id. ¶ 16 and Ex. 13.) After examining plaintiff, Dr. Chow's recommendations were as follows: (1) SLE-no ocular inflamation on examination; (2) Plaquenil use-no bull's eye maculopathy, Humphrey Visual Field appears within normal limits; and (3) extreme photophobia-no clear etiology on Dilated Fundoscopic Examination (no objective cause for his subjective photophobia was determined). (Id.) Follow-up appointments were scheduled, and there was no notation that plaintiff wear sunglasses. (Id.)

On July 21, 2010, a nurse examined plaintiff in response to plaintiff's July 18, 2010, sick-call request complaining of both back pain and that he was being exposed to too much sun. (Id. ¶ 17 and Exs. 5, 14.) The nurse scheduled a follow-up appointment for plaintiff in the medical clinic. Id. Plaintiff was seen on July 23, 2010, in connection with his back pain. (Id. ¶ 19 and Ex. 15.) Additionally, Lightsey submitted an order for plaintiff to receive Toradol for pain and Flexeril (muscle relaxant). (Id.) On August 5, 2010, plaintiff was seen in Central Prison's Optometry Clinic for complaints of changes in his visual acuity. (Id. ¶ 22 and Exs. 8, 18.) Plaintiff declined any new glasses at this appointment. (Id.)

6

In the interim, on July 23, 2010, plaintiff filed a grievance with the North Carolina Medical Board against Lightsey. (Pl.'s Aff. ¶ 16 (DE 86-2); Opp'n, Ex. P (DE 86-10)). Then, on August 11, 2010, plaintiff submitted a grievance complaining that he was being "blacklisted from seeing the physician."[4] (Opp'n, Ex. O.) At the step one response stage, prison officials noted the following:

> An investigation into the grievance that was submitted by [plaintiff] has revealed the following information as related by Ms. D. Mewhorter, Nurser Supervisor:
>
> [Plaintiff] arrived at JCI on June 16, 2010. PA reviewed record only on 6/23/2010 and 6/30/10. MD reviewed record only on 6/24/10, 7/1/2010, 7/21/2010, and 8/5/2010. It is the decision of MD/PA to see or not to see inmates. Nursing has no control over it. [Plaintiff] has been scheduled to be seen by PA on 8/25/2010.

(Id.) After appealing the step one response, prison officials, at the step three stage, responded that plaintiff "was seen by the PA on August 25, 2010 with new medication, x-rays, bed board and follow up appt in 3 to 4 weeks ordered." (Id.) On September 28, 2010, plaintiff filed a grievance, through the North Carolina Department of Public Safety administrative remedy procedure, complaining that Johnston was poorly designed to house Lupus patients. (Opp'n Ex. R.) Prison officials responded that plaintiff was not currently assigned as a groundskeeper or road squad and, thus, does not experience prolonged sun exposure. (Id.)

While plaintiff was in the process of pursuing his administrative remedies, plaintiff was seen by a nurse, on September 17, 2010, in response a sick call appointment request submitted on September 11, 2010, in which plaintiff complained that he needed a pair of gloves to warm his hands due to his Raynaud's disease. (Lightsey Aff. ¶ 31 and Ex. 25.) The nurse noted that plaintiff was

---

[4] Plaintiff's brother, Marvin Knowles, sent letters to defendant Smith, Administrator Jones, Robert C. Lewis, and the "Bahamas Consulate," expressing his concern over plaintiff's medical treatment. (DE 86, Ex. E.) Marvin Knowles did not receive responses from North Carolina Department of Public Safety officials. (Id.)

7

asymptomatic and that there was a pending UR request for the gloves. (Id.) A follow-up appointment was scheduled for September 22, 2010. (Id.)

On September 22, 2010, physician assistant Jackson ("PA Jackson") evaluated plaintiff regarding plaintiff's request for white cotton gloves. (Id. ¶ 32 and Ex. 26.) Plaintiff stated that his hands and fingers got very cold, and PA Jackson noted that plaintiff's hands were cold during the examination. (Id.) PA Jackson noted that a UR request already had been submitted, and then re-submitted the request. (Id.) Plaintiff also complained of worsening back pain and itching unrelieved by medications. (Id.) PA Jackson referred plaintiff to the physician clinic for his remaining complaints. (Id.)

Lightsey examined plaintiff on September 30, 2010, at which time plaintiff presented with complaints of lower back pain. (Id. ¶ 35 and Ex. 26.) Lightsey noted that plaintiff did not exhibit any obvious signs of disability, but that his right leg was slightly atrophied. (Id.) At the conclusion of the examination, Lightsey assessed plaintiff as malingering with respect to his complaints of back pain, as well as, neuralgia of the right leg. (Id.) Lightsey also ordered a serum westergren test and a serum antinuclear antibodies with titer test to determine if plaintiff was suffering from an acute flare of his SLE condition, which could cause back pain. (Id.) Finally, Lightsey ordered Indocine for plaintiff's pain. (Id.)

On October 7, 2010, Lightsey reviewed the results of the serum westergren test and serum antinuclear antibodies with titer test. (Id. ¶ 37 and Ex. 28.) Lightsey stated that if plaintiff had been suffering from an acute flare of his SLE condition causing back pain, his serum westergren test would have been elevated. (Id.) Plaintiff's serum westergren test was not elevated, so Lightsey determined that plaintiff's back pain was not related to his SLE condition and that sun exposure had

not triggered his SLE. (Id.) Plaintiff's serum antinuclear antibodies with titer test revealed abnormal levels of RNP Antibodies, Sjogren's Antibodies, and Anti-chromatin Antibodies. (Id.) Lightsey explained that abnormal levels of these antibodies is a non-specific finding and can be associated with drug-induced lupus, Sjogren's Syndrome, neonatal lupus, mixed connective tissue disease, and polymyositis and/or dermatomyositis. (Id.) Lightsey stated that the test results confirmed his belief that plaintiff was not suffering an acute flare of his SLE condition. (Id.) Lightsey ordered the following: (1) Plaquenil; (2) oyster shell calcium; and (3) twenty-four hour urinalysis for protein and creatinine clearance, as part of a SLE survey to confirm that plaintiff's kidneys were functioning normally. (Id.)

On October 20, 2010, plaintiff was seen by a nurse in response to a sick call request he submitted on October 18, 2010. (Id. ¶ 38 and Ex. 29.) At his appointment, plaintiff inquired about the status of the refill of his medication for itching and whether the UR request for gloves had been approved. (Id.) The nurse incorrectly noted that there was no current prescription for medication to treat plaintiff's itching and that the UR request for gloves had not yet been approved. (Id.) The nurse informed plaintiff that he had an appointment scheduled with the physician on October 28, 2010. (Id.)

On October 21, 2010, Lightsey reviewed the results of plaintiff's twenty-four hour urinalysis, which revealed protein and creatinine clearance in the normal range. (Id. ¶ 39 and Ex. 30.) Lightsey determined that plaintiff's urinalysis results were in an acceptable range given his various disease processes and did not reveal significant impairment of plaintiff's kidney function requiring further treatment. (Id.)

Lightsey examined plaintiff on October 28, 2010, in follow-up to plaintiff's September 30, 2010, appointment and October 20, 2010, sick call appointment. (Id. ¶ 40 and Exs. 28, 31.) Lightsey noted that plaintiff continued to complain of back pain, similar to pain he experienced prior to a previous discectomy. (Id.) In response to plaintiff's complaints of itching, Lightsey ordered Benadryl and renewed plaintiff's special wash for treatment of plaintiff's itching and rash. (Id.) With respect to plaintiff's pain complaints, Lightsey completed a consultation/referral form for Ultram and noted that plaintiff had complaints of pain in his back and right lateral foot for six months following a microdiscectomy. (Id.)

The UR request for white gloves was approved on October 26, 2010. (Id. ¶ 41 and Ex. 32.) Then, on November 12, 2010, plaintiff informed a nurse that the Isotoner gloves he received were not protecting his hands from the cold. (Id. ¶ 42 and Ex. 34.) Lightsey subsequently reviewed plaintiff's chart and determined that additional gloves were not necessary because Isotoner gloves, when worn regularly, were appropriate. (Id. ¶ 42.)

On January 21, 2011, plaintiff was seen by a nurse in response to a January 16, 2011, sick call request plaintiff submitted complaining of continued weakness in his right hand, severe joint pain, and chest pain. (Id. ¶ 49 and Exs. 38, 39.) Plaintiff informed the nurse that he felt his joints were locking up on him. (Id.) The nurse did not note any deformities, dislocations, or swelling. (Id.) Because plaintiff was already taking pain medications, the nurse recommended an analgesic balm and warm compresses. (Id.) Plaintiff was instructed to submit a sick call request if he was not better in five days or if he developed additional symptoms or his symptoms worsened. (Id.)

On February 2, 2011, plaintiff was seen by a nurse in response to a February 1, 2011, sick call request complaining that his joint pain had increased and that his right hand continued to get

weaker.  (Id. ¶  51 and Exs. 40, 41.)  The nurse referred plaintiff to a physician for further evaluation.  (Id.)  Plaintiff saw Lightsey on February 3, 2011, and Lightsey prescribed various medications.  (Id. ¶ 52 and Exs. 40, 41.)

Lightsey examined plaintiff on February 17, 2011, and noted that plaintiff complained of pain in the fourth finger of his right hand and that he was unable to grip effectively.  (Id. ¶ 54 and Exs. 31, 43.)  Upon examination, Lightsey noted that plaintiff had numbness and soreness, with minimal change in disease (of his rheumatoid arthritis).  (Id.)  Lightsey assessed plaintiff with systemic lupus and symptomatic erythematosus (swelling of the joints of his fingers caused by lupus).  (Id.)  Lightsey ordered laboratory tests in order to assess plaintiff's condition.  (Id.)

On March 23, 2011, plaintiff was examined by a nurse in response to a February 23, 2011, sick call appointment request in which he requested the results of a recent electrocardiogram ("EKG") and blood work.  (Id. ¶ 57 and Ex. 46.)  The nurse informed plaintiff that his EKG and lab tests were normal (except for slightly elevated triglycerides).  (Id.)  The nurse referred plaintiff to the physician's assistant.

On April 8, 2011, plaintiff was seen by a nurse in response to a April 4, 2011, sick call request in which he requested prescription renewals of Benadryl and Ultram, and a renewal of his medical notification slips for thermals, no prolonged sun exposure, two showers daily, new wristbands, and being allowed to get under a blanket as needed.  (Id. ¶ 59 and Ex. 47.)  The nurse referred plaintiff to the physicians's assistant.  (Id.)   On May 4, 2011, PA Jackson reviewed plaintiff's chart and entered an order allowing plaintiff to shower twice a day for three months, ordering that he should not be subjected to prolonged sun exposure for six months, and that these orders be reflected in an updated medical notification slip.  (Id. ¶ 60 and Ex. 48.)

On May 26, 2011, Lightsey examined plaintiff in connection with plaintiff's May 15, 2011, sick call appointment request regarding his request for "Dr. 2" shoes, thermal underwear, and his complaint of prolonged sun exposure. (Id. ¶ 62 and Exs. 46, 48, 50.) Upon examination, Lightsey noted that he was unable to visualize plaintiff's fundi due to plaintiff's non-compliance. (Id.) The medical records from plaintiff's July 14, 2010, visit to the Duke Eye Clinic revealed that his lupus was not causing ocular inflamation (his fundi was normal), that Plaquenil did not affect his sight, and that there was no medical reason for plaintiff's subjective photophobia. (Id.) Lightsey again concluded that there was no medical reason for plaintiff to wear sunglasses indoors. (Id.) Lightsey assessed plaintiff with conversional hysteria (a mental disorder in which physical symptoms, such as photophobia/photosensitivity can occur without apparent physical cause but appear to result from psychological conflict or need). (Id.) Lightsey ordered that a UR request for "Dr. 2" shoes be submitted citing arthralgia of lupus as justification. (Id.) Lightsey also signed off on a medical notification slip for plaintiff to receive thermals for three months. (Id.)

On October 26, 2011, Dora Plummer contacted Nurse Mewhorter to investigate a complaint she received from plaintiff stating that Lightsey has a vendetta against him and is using his position as a way to punish him by denying him adequate medical care. (Answer, Exhibit D (DE 56-4); Pl's Aff. ¶ 25.) Plaintiff, in his complaint, stated that all of his (DC-490) medical slips had expired. (Answer, Exhibit D (DE 56-4)). Nurse Mewhorter provided the following response:

> On 9/8/11 MD reviewed and wrote the following orders: "All DC #4901. Thermal underwear x6 months. No indication for sun exposure precautions, special wash, or 2 showers a day. Patient in prolonged remission from systemic Lupus." On 10/19/11 PA reviewed record and wrote order "Bed board x 12 mths." No sick call or Em encounters since 9/30/11.

(Id.)

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

B.    Analysis

Defendants each raise the defense of qualified immunity against plaintiff's § 1983 action. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

1.      Lightsey

Plaintiff alleges Lightsey acted with deliberate indifference to his serious medical needs.  "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' "  <u>Strickler v. Waters</u>, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting <u>Williams v. Griffin</u>, 952 F.2d 820, 824 (4th Cir. 1991)).  The Supreme Court has explained that the first prong is an objective one–the prisoner must show that "the deprivation of [a] basic human need was objectively sufficiently serious"–and the second prong is subjective–the prisoner must show that "subjectively the officials act[ed] with a sufficiently culpable state of mind." <u>Strickler</u>, 989 F.2d at 1379 (internal quotations omitted).

Lightsey argues that plaintiff is unable to satisfy the subjective prong of the Eighth Amendment test, which asks whether the defendant acted with deliberate indifference to the plaintiff's serious medical needs.  "Deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994).  It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm.  <u>Id.</u> at 837; <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995).  Mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-106 (1976); <u>Johnson v. Quinones</u>, 145 F.3d 164, 168 (4th Cir. 1998).

Beginning with plaintiff's allegation that Lightsey acted with deliberate indifference to plaintiff's allegations of overexposure to the sun, Lightsey states in his affidavit that not all lupus

14

patients suffer from sun-induced problems or photosensitivity. (Lightsey Aff. ¶ 6.) Lightsey further states that plaintiff did not present with symptoms related to SLE photosensitivity, which include a facial rash and fever. (Id. ¶ 65.) Plaintiff's medical records support Lightsey's assertion. (Id.) The record additionally reflects that Lightsey performed a number of diagnostic tests on plaintiff which confirmed that he was not suffering from an acute flare of his SLE related to sun exposure. (Id. ¶ 37.) Furthermore, Lightsey received and reviewed a recommendation from an ophthalmologist who opined that there was no etiology for plaintiff's alleged photophobia. (Id. ¶ 67.) Finally, the record reflects that Lightsey treated plaintiff for his various medical complaints each time plaintiff presented to Lightsey for evaluation. Thus, the record reveals that Lightsey diligently treated plaintiff and does not reflect that Lightsey disregarded a known serious medical condition, medical need, or risk of harm.

To the extent plaintiff alleges that Lightsey acted with deliberate indifference to his alleged need to wear sunglasses while indoors, plaintiff's medical records refute such a claim. Lightsey was consulted on July 1, 2010, to determine whether plaintiff should be permitted to wear sunglasses while indoors. (Lightsey Aff. ¶ 13.) In response, Lightsey reviewed plaintiff's medical chart and noted that sunglasses might be appropriate for an SLE patient with symptoms of activation of conjunctivitis due to ultraviolet radiation of bright sunlight. (Id.) However, Lightsey also noted that plaintiff had not presented with symptoms of conjunctivitis. (Id.) Lightsey further noted that Plaquenil, a drug plaintiff was taking, could exacerbate eye damage, but that plaintiff had not reported any symptoms indicative of such side effects. (Id.) As a result, Lightsey determined that there was no medical indication that plaintiff needed to wear sunglasses indoors. (Id.) Lightsey's observations were confirmed after Dr. Chow at Duke Eye Center examined plaintiff. Dr. Chow

determined that plaintiff's eyes were unaffected by the possible side effects of Plaquenil and that there was no clear organic etiology for plaintiff's photophobia. (Id. ¶ 16.) The record further reflects that Dr. Chow did not note a requirement that plaintiff wear sunglasses. (Id.) Finally, subsequent to diagnostic testing, Lightsey assessed plaintiff with conversional hysteria, which is a mental disorder in which physical symptoms, such as photophobia/photosensitivity, can occur without apparent physical cause but appear to result from psychological conflict or need. (Id. ¶ 62.)

The court now turns to plaintiff's contention that Lightsey acted with deliberate indifference to his complaints of itching/rashes, fatigue, and joint pain. Although itching is a common symptom in patients who present with lupus, plaintiff's complaints of itching were not due to an acute flare of his SLE, as diagnostic studies confirmed that plaintiff was not experiencing an SLE flare. (Lightsey Aff. ¶¶ 37, 39, 54, 62, and 65.) As with plaintiff's complaints of itching, joint pain is a common symptom associated with patients who have been diagnosed with SLE. (Id. ¶ 6.) However, as stated, diagnostic testing confirmed that plaintiff was not experiencing an acute SLE flare. (Id. ¶ 65.) Further, the record reflects that Lightsey was responsive to plaintiff's complaints of itching and joint pain, and that Lightsey renewed plaintiff's prescriptions to treat these conditions. Finally, a review of the record indicates that plaintiff never presented to Lightsey with complaints of fatigue.[5] (See Id. ¶¶ 1-50.)

The evidence in the record additionally reflects that from June 17, 2010, through June 20, 2011, Lightsey personally examined plaintiff on four occasions and performed chart reviews of plaintiff's medical record and/or test results on at least twenty-seven (27) occasions. (Lightsey Aff. ¶ 68.) In the course of treating plaintiff, Lightsey gave telephone orders and/or verbal orders

---

[5] Plaintiff's medical records indicate that he complained of fatigue on only one occasion. (Lightsey Aff. ¶ 11.) A nurse assessed plaintiff, but did not refer plaintiff to Lightsey at the conclusion of that visit. (Id. ¶¶ 11, 12.)

16

on at least three occasions and approximately six Utilization Review Requests ("UR requests") were submitted for various treatment modalities, including, but not limited to diagnostic studies, medications and specialist referrals. (Id.) Also, during the relevant time period, Lightsey referred plaintiff to an ophthalmologist. (Id.) Accordingly, the record reflects that Lightsey provided continual care for plaintiff's various complaints and was responsive to plaintiff's medical needs. Plaintiff's complaints about Lightsey's treatment amount to nothing more than a disagreement as to the proper medical treatment, which is insufficient to establish a constitutional violation. See King v. United States, 536 F. App'x 358, 363 (4th Cir. 2013).

To the extent PA Jackson entered an order limiting plaintiff's exposure to the sun on May 4, 2011, such treatment reflects a disagreement between medical professionals as to the appropriate course of treatment. Such a disagreement does not constitute deliberate indifference in violation of the Eighth Amendment.[6] See, e.g., Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977). Additionally, to the extent plaintiff alleges that Lightsey's treatment of plaintiff may not have been effective, this does not give rise to a constitutional violation. See, e.g., Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975); Starling v. United States, 664 F. Supp. 2d 558, 569-70 (D.S.C. 2009); see also Johnson, 145 F.3d at 167 (finding that negligent acts are not sufficient to establish a constitutional violation). Moreover, plaintiff's requests for particular medications or to see specialists, such as a neurologist, amount to nothing more than a disagreement over the proper course of treatment. As stated, such a disagreement does not constitute an Eighth Amendment claim. See Wright, 766 F.2d at 850.

---

[6] The court notes that, at most, plaintiff states a claim for negligence or medical malpractice, which does not arise to the level of an Eighth Amendment violation. See Estelle, 429 U.S. 97, 105-06 (1976); Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986).

Therefore, because plaintiff has not established the subjective element of his Eighth Amendment deliberate indifference claim, there is no constitutional violation. Based upon the foregoing, Lightsey is entitled to qualified immunity for plaintiff's claim, and his motion for summary judgment is GRANTED.

2.    Lewis and Smith

Plaintiff alleges that Lewis and Smith failed to adequately address his medical needs despite plaintiff's several requests for assistance. In particular, plaintiff contends that he complained to Lewis and Smith that the design and policies at Johnston were not favorable for lupus patients, and exposed him to harmful levels of sun exposure. In particular, plaintiff alleges that he complained that the following Johnston policies were detrimental to his health: (1) the policy which required inmates to evacuate the dormitory between the hours of 10:00 am and 12:00 pm; (2) the policy which required inmates to exercise in outdoor areas; (3) the policy which required inmates to stand outdoors to retrieve legal mail; and (4) the policy which required inmates to wait in meal and medical lines outdoors.

Supervisors in a § 1983 action may not be held liable based upon a theory of *respondeat superior*. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978). Instead, "liability ultimately is determined 'by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.' " Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984)). To establish supervisor liability under § 1983, a plaintiff must establish:

> (1)    that the supervisor had actual or constructive knowledge that
> his subordinate was engaged in conduct that posed "a

18

pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

(2)     that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and

(3)     that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw, 13 F.3d at 799.

Here, the evidence in the record reflects that plaintiff filed complaints and grievances related to the above-stated issues, and that the North Carolina Department of Public Safety ("DPS") staff thoroughly reviewed and responded to plaintiff's complaints. (Mewhorter Aff. ¶¶ 7, 10.) As part of prison officials' investigation, they contacted DPS medical staff who reviewed plaintiff's complaints regarding sun exposure and determined that plaintiff was not suffering from over-exposure to sunlight, nor was plaintiff suffering from a health condition that would cause him pain or suffering if he was exposed to sunlight. (Id. ¶ 9.) Moreover, as was done in this case, prison officials are entitled to rely on medical judgments and expertise of prison physicians and medical personnel concerning the course of treatment deemed necessary for prisoners. See Shakka, 71 F.3d at 167 (citing Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990)); Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) ("Prison officials cannot substitute their judgment for a medical professional's prescription.").

Additionally, there is no evidence that Lewis or Smith had actual or constructive knowledge that any subordinate was engaged in conduct that posed a pervasive and unreasonable risk of injury. Nor has plaintiff shown any causal link between these defendants' alleged actions and plaintiff's alleged injury. See Slakan, 737 F.2d at 372-73. Plaintiff further has not presented any evidence

19

to show that the response to plaintiff's complaints by Lewis or Smith was so inadequate to demonstrate deliberate indifferent.  Rather, at most, the record reflects a disagreement as to plaintiff's medical treatment, which is not sufficient to establish a constitutional violation.  See Wright, 766 F.2d at 849. Thus, the court finds no constitutional violation, and that Lewis and Smith are entitled to qualified immunity.

3.      ADA Claim

Plaintiff's ADA claim is not entirely clear.  To the extent he seeks to bring an ADA claim based upon alleged inadequate medical treatment, his claim fails because the ADA does not address such issues.[7] See Goodman v. Johnson, 524 F. App'x 887, 890 (4th Cir. 2013) (citing Simmons v. Navajo Cnty., 609 F.3d 1011, 1021-22 (9th Cir. 2010) and Fitzgerald v. Corrs Corp. of Am., 403 F.3d 1134, 1144 (10th Cir. 2005)).

To the extent plaintiff seeks relief pursuant to the ADA due to the failure to accommodate his alleged need to limit his sun exposure, this claim also is without merit.  Title II of the ADA, which applies to state prisons, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity."  42 U.S.C. § 12132; Pa. Dept. of Corr. v. Yesky, 524 U.S. 206, 210-13 (1998).  To establish a *prima facie* case under the ADA, the plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was

---

[7]  The ADA is designed to prohibit discrimination on the basis of disability; it does not address the adequacy of medical treatment.  See Goodman, 524 F. App'x at 890.

by reason of his disability.  See Constantine v. George Mason Univ., 411 F.3d 474, 498 (4th Cir.2005); Baird v. Rose, 192 F.3d 462, 467 (4th Cir.1999).  The Fourth Circuit Court of Appeals has recognized "three district grounds for relief:  (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations."  A Helping Hand, LLC v. Baltimore County, 515 F.3d 356, 362 (4th Cir. 2008).

Plaintiff, in this case, presented only vague and conclusory allegations, which are insufficient to demonstrate a violation of the ADA.  See Goodman, 524 F. App'x at 890; see, e.g., Barnes v. Young, No. 7:12cv00067, 2013 WL 1122704, at *1 (W.D. Va. Mar. 18, 2013).  Further, the record reflects that prison officials investigated plaintiff's complaints regarding the Johnston policies, and medical staff reported that plaintiff was not suffering from overexposure to the sun.  Accordingly, defendants' decisions as to the Johnston policies were based upon medical treatment decisions and not for any discriminatory reason.  See, e.g., Holland-El-Maynard, No. WDQ-13-1251, 2013 WL 6145110, at * 3 (D.Md. Nov. 20, 2013) (citing Fitzgerald, 403 F.3d 1134, 1144)).  Further, plaintiff has presented no evidence of discrimination.  See Goodman, 524 F. App'x at 890; see, e.g., McCoy v. Stouffer, No. WDQ-10-1583, 2013 WL 4451079, at *17 (D. Md. Aug. 15, 2013) (finding no ADA claim where plaintiff, *inter alia*, failed to establish that he was discriminated against due to his disability).  Rather, as stated, the evidence reflects that Lewis and Smith investigated plaintiff's complaints, and that medical staff informed plaintiff that no accommodation was necessary.  Plaintiff has not presented any evidence to the contrary.  Accordingly, his ADA claim fails.

4.      New Retaliation Claim

Plaintiff raises a new claim for retaliation in response to defendants' motions for summary judgment.  In response, Lightsey, in his reply, argues that the court should not consider plaintiff's

new claims because he failed to request leave of court, pursuant to Federal Rule of Civil Procedure 15(a), to include any new claims. The court agrees with Lightsey. Because plaintiff has not moved this court to amend his complaint pursuant to Rule 15(a) to include any new claim, the retaliation claim is not properly before the court and is DISMISSED without prejudice. See United States v. Jones, No. 87-7313, 1988 WL 21257, at *1 (4th Cir. Mar. 9, 1988); see also Crump v. N.C. Dep't of Corr., No. 3:05CV325-02-MU, 2009 WL 2738459, *5 (W.D.N.C. Aug. 26, 2009).

## CONCLUSION

Based upon the foregoing, the pending motions for summary judgment (DE 71, 74) are GRANTED. Plaintiff's retaliation claim is DISMISSED without prejudice. The Clerk of Court is DIRECTED to close this case.

SO ORDERED, this the 20th of March, 2014.

LOUISE W. FLANAGAN
United States District Judge